◼ JACK M. LESTER et al., Respondents, v IRVING LEVICK et al., Appellants.—In an action *inter alia* to recover upon a written agreement for the sale and repurchase of corporate stock, defendants appeal from an order of the Supreme Court, Westchester County, entered February 27, 1975, which denied their motion to dismiss the complaint and for summary judgment. Order affirmed, with $50 costs and disbursements. Defendants' motion was based on the ground that the first cause of action seeks to enforce a usurious transaction and that the second cause of action was insufficient to constitute an action to recover damages based on fraudulent representations. Special Term denied the motion on the ground that factual issues were raised, thus requiring a trial. With this disposition we agree. The agreement between the parties was entered into on August 21, 1970. Defendant Levick had been in the real estate business prior to 1970. It appears that he suffered financial reverses and had to pledge and refinance much of his real estate interests, which made them completely illiquid. Through a business acquaintance, Levick was introduced to Griggs Equipment Co., Inc. (Griggs),

which had substantial funds and which Levick thought might be interested in purchasing his real estate interests for cash and stock. According to plaintiff Lester, Levick was to receive approximately 500,000 shares of Griggs' stock. In order to consummate his planned transaction with Griggs, Levick found it necessary to purchase a large block of Griggs' stock. Levick claims he was advised that 17,700 shares were available and that ownership of such shares would be of great advantage to him in presenting his "real estate package" to the Griggs board of directors. Lester claims that this block of stock had to be purchased in order to consummate the proposed sale of real estate, because the stock was held by a dissident stockholder. In any event, the 17,700 shares were to be purchased for more than the market price. In order to purchase this block of shares, it was necessary for Levick to raise money. Levick contacted defendant Greenspan who proceeded to introduce Lester to Levick. Lester contends that at no time was the resulting transaction ever characterized as a loan. Greenspan, on the other hand, states that from the outset he described the proposed transaction as a loan. The details of the negotiations leading up to consummation of the agreement at issue are disputed. According to Lester, Greenspan stated that he would be investing $25,000 of his own funds in the transaction. Lester further contends that Greenspan gave Levick "the highest recommendations" and said that "he was worth millions * * * and that there was nothing to worry about." Lester claims that he relied upon these representations, and that without them he "would not have entered into the transaction in the first instance." Greenspan contends that he never represented that he was advancing his own moneys and, furthermore, that where he obtained his funds was "none of plaintiffs' business." Since a total of $135,000 was required, and since Greenspan's investment was to be $25,000, a $110,000 investment by Lester was required. Lester did not have sufficient funds to make up the $110,000, but proceeded to make inquiries of the coplaintiffs, who agreed to participate in the transaction. According to Lester, he suggested to Greenspan that he, Lester, have his attorneys "look into the transaction so as to prepare the necessary papers for the protection of the purchasers." Lester claims that Greenspan said this would not be necessary, "since he had an attorney who would draw up the necessary papers". Greenspan denies that he ever discouraged Lester from using his own attorney and further claims that Lester "actually asked me to obtain an attorney". By the agreement in issue Levick agreed to sell 17,700 shares of stock in Griggs for the sum of $135,000; Levick was then to repurchase these shares within one year for $135,000 in cash and 25,000 additional shares of Griggs, which additional shares were to have a market value of no less than $135,000. In the event the additional 25,000 shares were worth less than $135,000 Levick was to provide such additional shares, beyond the 25,000, as were necessary, to the end that the market value of all shares used to repurchase the original block of 17,700 shares would be equal to $135,000. In addition, Levick agreed to execute a note payable to Lester (who was acting on behalf of all plaintiffs) in the amount of $100,000 payable five and one-half years from the date of the agreement. The agreement further provided that Levick would deposit with Lester all of the outstanding stock in Levick's real estate business. In the event of a default of the repurchase obligation, this real estate stock could be utilized by plaintiffs to the extent of $270,000. Should this stock be worth less than $270,000, Levick agreed to be personally liable for any deficiency. Plaintiffs were further protected by Levick's assignment of a $270,000 insurance policy on his life to Lester, with the proceeds of the policy to be applied to

the repurchase obligation in the event of Levick's death. The issues of usury and fraud arising from the transactions leading to the agreement and in the provisions of the agreement itself cannot be resolved on the face of affidavits, which are replete with self-serving declarations and bristling with contradictory statements of the parties. The intent of the parties to the agreement is always relevant to the issue of usury (*Rosenstein v Fox*, 150 NY 354; *Bullock v Becker*, 52 Misc 2d 698, affd 27 AD2d 647). Moreover, it is always an important element in a transaction claimed to be usurious whether the party against whom the agreement is sought to be enforced "promoted the investment and drew the contracts" (*Leibovici v Rawicki*, 57 Misc 2d 141, 145, affd 64 Misc 2d 858; cf. *Orvis v Curtiss*, 157 NY 657; *Salter v Havivi*, 30 Misc 2d 251; Ann 16 ALR 3d 510), especially where the scheme originated with that party and his attorney (cf. *Schanz v Sotscheck*, 167 App Div 202; *Hungerford Brass & Copper Co. v Brigham*, 47 Misc 240). In any event, the ingredients of usury should be proved "with reasonable certainty, and * * * they shall not be established by mere surmise and conjecture, or by inferences entirely uncertain" (*White v Benjamin*, 138 NY 623, 624). Here, the intent of the parties is not clear and the conduct of defendants in planning and advancing the transaction is open to varying inferences. Under these circumstances, a plenary trial is necessary. Hopkins, Acting P. J., Cohalan and Brennan, JJ., concur; Christ, J., dissents and votes to reverse the order and grant the motion, with the following memorandum, in which Shapiro, J., concurs: There is no dispute concerning the terms of the agreement sought to be enforced by plaintiffs. It is clear that plaintiff Lester was to "purchase" stock from Levick for $135,000 and that Levick was *obligated* to repurchase the stock within one year after the original transfer for cash and securities worth $270,000. In addition, Levick agreed, as part of the over-all transaction, to execute a note payable to Lester in the amount of $100,000 payable in five and one-half years after the date of the agreement. To insure that plaintiffs would receive $270,000 even if a repurchase never took place, the agreement further provided that Levick would deposit with Lester all of the outstanding stock in Levick's real estate business. In the event of a default of the repurchase obligation, this real estate stock could be utilized by plaintiffs to the extent of $270,000. Should this stock be worth less than $270,000, Levick agreed to be personally liable for any deficiency. Plaintiffs were further protected by Levick's assignment of a $270,000 insurance policy on his life, with the proceeds of the policy to be applied to the repurchase obligation in the event of Levick's death. The agreement sought to be enforced is, on its face, a usurious loan. Plaintiffs would realize $270,000 in one year for a consideration of $135,000 whether or not the contemplated "repurchase" ever took place. The stated intent of plaintiffs presents no triable issue of fact under these circumstances. The intent which enters into and is essential to constitute usury is simply the intent to take or reserve more than the maximum legal rate of interest for the loan or forbearance of money (*Fiedler v Darrin*, 50 NY 437; *National Equip. Rental v Stanley*, 177 F Supp 583, affd 283 F2d 600). If the parties intended that which results in usury, then, in legal effect, they intended usury (*Vee Bee Serv. Co. v Household Fin. Corp.*, 51 NYS2d 590, affd 269 App Div 772). Clearly, the intent which will violate the statute is a general and not a specific intent (32 NY Jur, Interest and Usury, § 72), and, in the case at bar, the usurious intent of plaintiffs is plain upon the face of the agreement. Nor is proof of subjective intent necessary merely because the agreement was couched in terms of a sale and repurchase. A *transaction must be considered in its totality and judged by its real character*, rather

than by the name, color, or form which the parties have seen fit to give it *(Quackenbos v Sayer,* 62 NY 344). The clearest evidence that this was a loan of money and not a sale of stock is found in the fact that Levick was obligated to repurchase the stock within one year after the original transfer. It was not a privilege or right to reacquire; it was a duty imposed to retake the stock and to do so for a consideration that was unconscionable. Plaintiffs did not take the stock as an acquisition of an asset which they could hold or sell; they took it as collateral for a loan. There are no triable issues as to this and the transaction is clearly a usurious loan sought to be disguised and fogged by purchase talk. While under some circumstances it may be important to consider who promoted the investment and drew the contracts, such a consideration is totally irrelevant where the transaction is, on its face, a usurious loan. The statute provides that usurious contracts are *void* (General Obligations Law, § 5-511), and it cannot seriously be argued that a usurious loan, clear on its face, can be salvaged merely because the borrower promoted the loan or because the borrower drew up the contract. Plaintiffs' cause of action for fraud necessarily depends for its validity on the enforceability of the subject agreement. Accordingly, both causes of action should have been dismissed and summary judgment in favor of defendants should have been granted on the Levick counterclaim.