**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FAST TRAK INVESTMENT
COMPANY, LLC, a Delaware
limited liability company,
*Plaintiff-Appellee*,

v.

RICHARD PHILIP SAX,
individually and as principal for
The Law Offices of Richard Sax;
LAW OFFICES OF RICHARD SAX, a
sole proprietorship,
*Defendants-Appellants.*

No. 18-17270

D.C. No.
4:17-cv-00257-
KAW

CERTIFICATION
ORDER TO THE
NEW YORK
COURT OF
APPEALS

Filed June 11, 2020

Before: Richard A. Paez and Carlos T. Bea, Circuit Judges,
and Janis Graham Jack,[*] District Judge.

Order

---

[*] The Honorable Janis Graham Jack, United States District Judge for
the Southern District of Texas, sitting by designation.

## SUMMARY**

**Certification to New York Court of Appeals**

The panel certified to the New York Court of Appeals the following questions:

1) Whether a litigation financing agreement may qualify as a "loan" or a "cover for usury" where the obligation of repayment arises not only upon and from the client's recovery of proceeds from such litigation but also upon and from the attorney's fees the client's lawyer may recover in unrelated litigation?

2) If so, what are the appropriate consequences, if any, for the obligor to the party who financed the litigation, under agreements that are so qualified?

### COUNSEL

Richard Sax, Law Office of Richard Sax, Santa Rosa, California, for Defendants-Appellants.

Kira A. Schlesinger, Schlesinger Conrad PLLC, Phoenix, Arizona, for Plaintiff-Appellee.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**ORDER**

This case asks us to determine whether a litigation funding agreement violates New York's usury laws. Richard Sax[1] and Fast Trak Investment Co., LLC ("Fast Trak") entered a series of contracts in which Fast Trak agreed to fund lawsuits Sax brought as the attorney of record, in exchange for his and his clients' pledges of proceeds from those cases, as well as Sax's pledges of his attorney fees in unrelated cases. After Sax obtained proceeds or attorney fees in some of those cases but did not pay them to Fast Trak as purportedly required by the agreements, Fast Trak sued Sax for, among other things, breach of contract and breach of fiduciary duty.

Below and on appeal, Sax argued that the contracts are unenforceable because they are usurious loans.[2] The district court rejected both arguments and granted Fast Trak's summary judgment motion, holding that the agreements were enforceable under New York law (which the parties had contractually selected). The court subsequently awarded Fast Trak $323,611.11 in damages, which Sax does not appeal.

To resolve Sax's purported usury defense, however, would require us to address what appears to be an unanswered question of New York usury law. In New York,

---

[1] Sax's law firm, The Law Offices of Richard Sax, is also a defendant in this case. Unless otherwise noted, we refer to Sax and his law firm collectively as "Sax."

[2] Sax also argued that the that the contracts are unenforceable because they violate laws against champerty. We do not certify this question to the New York Court of Appeals because we are able to resolve it by applying New York law.

usury laws typically apply *only* to agreements that constitute a "loan." *See Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992) ("If the transaction is not a loan, 'there can be no usury, however unconscionable the contract may be.'") (quoting *Orvis v Curtiss*, 157 N.Y. 657, 661 (1899)). On the other hand, the New York Court of Appeals has long held that a device to cover a usurious loan, even if not technically a loan, will permit a defense of usury to claims of breach. *See, e.g.*, *Orvis*, 157 N.Y. at 660–61. And at least one lower court in New York has found a non-recourse litigation financing agreement to qualify as a "loan" that violates usury laws. *Echeverria v. Estate of Lindner*, 801 N.Y.S.2d 233, 2005 WL 1083704, at *8 (Sup. Ct.), *judgment entered sub nom. Echeverria v. Lindner* (N.Y. Sup. Ct. 2005). Given the novelty of the issue and the impact its resolution may have in a rapidly growing industry,[3] we certify to the New York Court of Appeals the following question:

> Whether a litigation financing agreement may qualify as a "loan" or a "cover for usury" where the obligation of repayment arises not only upon and from the client's recovery of proceeds from such litigation but also upon and from the attorney's fees the client's lawyer may recover in unrelated litigation?

> *And*, *if so*, what are the appropriate consequences, if any, for the obligor to the

---

[3] The New York City Bar Association estimated the amount of litigation financing outstanding to exceed $1 billion in 2011. Ass'n of the Bar of the City of N.Y. Comm'n on Prof'l and Judicial Ethics, Formal Op. 2011-2, 2011 WL 6958790 at *1 ("N.Y. Bar Opinion").

party who financed the litigation, under agreements that are so qualified?

## I.

Fast Trak, a Delaware LLC with its principal place of business currently in New Jersey, is in the litigation finance business. Sax is a personal injury lawyer whose residence and principal place of business is in California. Fast Trak entered a series of agreements with Sax and Sax's clients in the spring of 2013, each of which contained a New York choice-of-law clause. These agreements can be divided into two categories, "Primary Contracts" and "Secondary Contracts."

Primary Contracts are those between Fast Trak and one of Sax's *clients*, in which Fast Trak agreed to provide funds directly to the client, who in turn pledged to Fast Trak a portion of the future proceeds, if any, from his or her litigation (in which Sax acted as the client's attorney). Most payments by Fast Trak to Sax's clients ranged from $3,000 to $15,000. One client received a total of $96,000 from Fast Trak as memorialized in four agreements. Even though the Primary Contracts state that Fast Trak provides the funds directly to the client (the "Seller" under each agreement), the funds appear to have been wired directly from Fast Trak to Sax in most cases. The exact amount that Fast Trak transferred to Sax and/or his clients is disputed, with Sax arguing that it is $125,000 and Fast Trak claiming it was "at least" $132,000.

Rather than entitling Fast Trak to receive a *percentage* of any damages award, the Primary Contracts each contain a "Payment Schedule." Each Payment Schedule outlines the minimum *amount* that the client counterparty must pay to Fast Trak, at a given time, from any received proceeds from

the client's litigation.   The minimum payment amounts increase in six-month increments from the date of executing the agreement. The Payment Schedule functions such that the longer it takes the client to receive proceeds from his or her litigation, the more the client will pay to Fast Trak (if the client receives any such proceeds at all).  For example, Fast Trak's Primary Contract to transfer $3,000 to Sax's client, Roger Gadow, contains the following payment schedule:

| | |
|---|---|
| A.  Property to be purchased from the       Seller under the agreement: | $3,000.00 |
| B.  Payment Schedule: | |
| Total Pay-Off Amount to be paid by the Seller to FAST TRAK: | |
| Minimum amount due on or before the first six (6) month Anniversary: | $4,716.51 |
| After Six (6) month Anniversary, but on or before One Year Anniversary: | $5,631.76 |
| After One Year Anniversary, but on or before 18 month Anniversary: | $6,724.61 |
| After 18 month Anniversary, but on or before Two Year Anniversary: | $8,029.54 |
| After Two Year Anniversary, but on or before 30 month Anniversary: | $9,587.69 |
| After 30 month Anniversary, but on or before Three Year Anniversary: | $11,448.20 |
| **After the Three-Year Anniversary, the total pay-off amount shall continue to increase in a Similar fashion by $450.00 for each additional six-month period.** | |

In other words, if Gadow receives sufficient proceeds from his litigation the day after executing the Primary Contract, he must pay Fast Trak $4,716.51 (providing Fast Trak a

57.2% return on investment or "ROI"). Or if Gadow receives sufficient proceeds from his litigation, say, twenty months after executing the Primary Contract, Gadow must pay Fast Trak $8,029.54 (a 167.7% ROI for Fast Trak). As we explain below, if we were to hold that the increase in payments over time constitutes "interest" on a "loan," the effective interest rates in all of the agreements between Fast Trak and Sax would exceed the maximum statutory interest rate for both civil and criminal usury.

However, the agreements are clear that if the client does not obtain proceeds from his or her litigation sufficient to make the scheduled payments, the client has *no personal obligation* to pay Fast Trak out of his or her own pocket or estate: most Primary Contracts state in bold that "[t]his is a nonrecourse purchase agreement. There is no obligation for seller to make payment except from the proceeds of the matter/litigation." The limited nature of this obligation, though, appears to be why Fast Trak and Sax entered the Secondary Contracts: to "induce" Fast Trak to invest in Sax.

The Secondary Contracts were signed only by Fast Trak and Sax (and not Sax's clients). After referencing a specific underlying Primary Contract, each Secondary Contract states that it was executed "[i]n order to induce Fast Trak to enter" such corresponding Primary Contract. For example, for the $3,000 Gadow contract, Sax signed a Secondary Contract with Fast Trak to induce Fast Trak to enter that Primary Contract with Gadow. Sax gets no additional funds for signing the Secondary Contract. Instead, Sax provides a list of his cases (deemed the "Secondary" cases) that are unrelated to Gadow's case (the "Primary" case), and promises that:

> If there has not been a monetary recovery in
> the "Primary" case great enough to pay the

entire balance due pursuant to [the Payment Schedule of this Agreement] at the time when the first (first means "earliest to occur") "Secondary" case yields any monetary recovery by settlement, judgment or otherwise; SAX shall than pay to FAST TRAK an amount equal to the entire remaining balance then due as per [the Payment Schedule] of this agreement.

In other words, if Gadow's case loses (or wins but does not obtain sufficient proceeds to satisfy the Payment Schedule), the corresponding Secondary Contract functions as Sax's agreement to cover the difference by paying Fast Trak from his receipts of attorney fees in unrelated cases.

For each Secondary Contract, Sax pledged his attorney's fee in about five to ten unrelated cases. In other words, each Primary and Secondary Contract pair is self-described as a non-recourse "purchase" of future proceeds, which does not obligate repayment to Fast Trak from a client or from Sax's personal credit or estates. But because Sax pledged his attorney fees in so many other unrelated cases (such that he states it would be enough to bankrupt his firm), the result of this arrangement is, according to Sax, that payment to Fast Trak by Sax is all but guaranteed.

Additionally, the Primary Contracts each include an exhibit containing "Irrevocable Instructions to Counsel" in which the client directs Sax (or any successor attorney) to pay any received proceeds from the litigation to Fast Trak before paying them to the client. Sax also signed an "Acknowledgement by Counsel" exhibit for each Primary Contract, in which he promised to:

"honor the assignment by [his client] to [Fast Trak] . . . including without limitation: (a) holding, *as fiduciary for [Fast Trak]*, any Proceeds (as defined in the Agreement), together with any permitted fees and costs as set forth in the Agreement; (b) promptly notifying [Fast Trak] that I [Sax] have become possessed of any Proceeds and (c) providing information to [Fast Trak] about the Claims and any related litigation."

In the Primary Contracts, each client represents that he or she "intends this transaction to be and agrees that this transaction is a purchase and sale and is not a loan," and acknowledges that Fast Trak has "no influence, power or control over any matter relating to the Litigation." Further, both the Primary and Secondary Contracts contain clauses by which Sax and his clients agreed to "waive[] any and all defenses to the enforcement of this Agreement . . . and specifically and unconditionally waive[] any claims that . . . any . . . provision of this Agreement . . . is invalid or unenforceable in any respect."

Fast Trak ultimately sued Sax for breach of contract and breach of fiduciary duty.[4] In response to Fast Trak's motion for summary judgment, Sax's primary arguments were that the contracts are not enforceable because they are usurious

---

[4] Fast Trak also sued to compel arbitration and for a writ of attachment, neither of which are at issue on appeal. After filing a motion for summary judgment, Fast Trak acknowledged that the arbitration claim was moot.

and because they violate laws against champerty.[5] The district court rejected both arguments and entered summary judgment on both claims for Fast Trak. The district court requested supplemental briefing on the amount of damages, and, in response to Fast Trak's briefing, Sax stated he took "no position regarding the damages claimed by Plaintiff." The district court reviewed Fast Trak's calculations and awarded it $323,611.21 in damages.

## II.

## A.

The district court granted summary judgment to Fast Trak on the grounds that "[u]nder New York law, 'if the transaction is not a loan, there can be no usury, however unconscionable the contract may be.'" *Fast Trak Inv. Co. v. Sax*, No. 4:17-CV-00257-KAW, 2018 WL 2183237, at \*6 (N.D. Cal. 2018) (citing *NY Capital Asset Corp. v. F & B Fuel Oil Co.*, 98 N.Y.S.3d 501, 2018 WL 1310218, at \*6 (N.Y. Sup. Ct. 2018)). On appeal, Sax argued that his agreements with Fast Trak "were illegal, usurious, and champertous recourse loans," but provided little detail that would directly or obviously support this argument. Instead, he simply argued that "[t]he subject transactions were usurious" and "[t]he parties intended the subject transactions to be recourse loans." He also described the terms of the agreements, and stated that "Fast Track [sic] would thus recover unless Sax lost each and every case that was pledged in its entirety," and that Fast Trak's assertions to the contrary were "misleading" and "illusory." Finally, he stated that

---

[5] The district court held that the New York choice-of-law provisions in the contracts was enforceable. On appeal, Sax agrees that New York law applies.

"even if the 'Primary Cases' did not deliver adequate returns, Fast Track [sic] would not lose its investment, because it had demanded the right to collect the 'entirety' of Sax's attorney fees from a string of secondary cases in his law firm, by way of an ambiguous, even incomprehensible, contract of adhesion."

Thus, Sax has made out the following argument: his agreements with Fast Trak predictably and effectively guaranteed repayment to Fast Trak from clients' and Sax's assets, at interest rates that are usurious. As such, they constitute usurious loans under New York law, or are at least a device by Fast Trak to cover a usurious loan, and are thus unenforceable. Therefore, the district court erred in granting Fast Trak's motion for summary judgment. For the reasons discussed below, we certify the above question to the New York Court of Appeals.

**B.**

New York's usury statute provides, in relevant part:

> 1. The rate of interest, as computed pursuant to this title, upon the *loan* or forbearance of any money, goods, or things in action, . . . shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law.

> 2. No person or corporation shall, directly or indirectly, charge, take or receive any money, goods or things in action as interest on the loan or forbearance of any money, goods or things in action at a rate exceeding the rate above prescribed. The amount charged, taken or received as interest *shall include any*

> *and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance . . . .*

N.Y. Gen. Oblig. Law § 5-501 (McKinney) (emphases added). In turn, section 14-a of the banking law provides that the maximum rate of interest provided for in section 5-501 is a 16% simple interest rate per year. N.Y. Banking Law § 14-a(1) (McKinney). New York courts have interpreted section 5-501(2) literally, and included in the calculation of interest *all payments or amounts owed* to the lender "in consideration of the making of a loan or forbearance of money." *Feldman v. Kings Highway Sav. Bank*, 102 N.Y.S.2d 306, 307 (App. Div.), *aff'd*, 303 N.Y. 675 (1951); *see also Band Realty Co. v. N. Brewster, Inc.*, 37 N.Y.2d 460, 464–66 (1975). Finally, section 5-511 of that chapter states that any contract under which a "greater value, for the loan or forbearance of any money . . . than is prescribed in section 5-501, *shall be void. . . .*" N.Y. Gen. Oblig. Law § 5-511 (McKinney) (emphasis added).

New York also has a *criminal* usury statute, which was "designed to prohibit 'loansharking.'" Practice Commentary to N.Y. Penal Law § 190.40 (McKinney). The criminal usury statute provides for a higher statutory rate of 25% simple interest annually. N.Y. Penal Law § 190.40 (McKinney). Further, the same 25% annual rate constitutes "[c]riminal usury in the first degree" if "the actor's conduct was part of a scheme or business of making or collecting usurious loans."[6] *Id.* § 190.42.

---

[6] In New York, although corporations cannot bring a usury defense in civil actions, N.Y. Gen. Oblig. Law § 5-521(1), (3) (McKinney), this

Put simply, sections 5-501 and 5-511 make any contract "void" that provides for (1) a "loan" (2) that charges an effective annual interest that exceeds 16% (i.e., that includes any and all amounts payable under the contract). As explained below, element (2) is easily satisfied in this case. Accordingly, because the case depends on whether the financial agreement qualifies as a loan, the answer to the certified question would resolve this issue.

## C.

All of the Primary and Secondary Contracts charge effective annual interest rates that—if the Contracts constitute loans—far exceed the statutory maximum of 16% annually. By way of example, the Gadow Primary Contract, described above, as well as the Secondary Contract between Sax and Fast Trak, contain the below Payment Schedule (the interest calculations in the far right column do not appear in the contracts themselves).

---

prohibition does not apply to Richard Sax, a natural person, and his law firm, a sole proprietorship.

|  | | Annually Compounded Interest[7] |
|---|---|---|
| A. Property to be purchased from the Seller under the agreement: | $3,000.00 | |
| B. Payment Schedule: | | |
| Total Pay-Off Amount to be paid by the Seller to FAST TRAK: | | |
| Minimum amount due on or before the first six (6) month Anniversary: | 4,716.51 | |
| After Six (6) month Anniversary, but on or before One Year Anniversary: | 5,631.76 | **87.7%** |
| After One Year Anniversary, but on or before 18 month Anniversary: | 6,724.61 | |
| After 18 month Anniversary, but on or before Two Year Anniversary: | 8,029.54 | **42.6%** |
| After Two Year Anniversary, but on or before 30 month Anniversary: | 9,587.69 | |

[7] These interest rates were not calculated by Sax or included in the record. We calculated them by "the traditional method of computing interest" endorsed by the New York Court of Appeals. *Band Realty Co.*, 37 N.Y.2d at 466.

| After 30 month Anniversary, but on or before Three Year Anniversary: | 11,448.20 | **42.6%** |
|---|---|---|

As shown in the table, the conditional payment obligations that the Contracts impose upon Gadow and/or Sax would, if they constitute loans, well exceed the civil statutory maximum interest rate of 16% per annum (compounded annually), as well as the criminal statutory maximum of 25% per annum (compounded annually).  The same is true for all the Primary and Secondary Contracts under which Fast Trak is suing Sax: the amounts of payment which they conditionally obligate Sax and his clients to pay exceed the statutory rate for criminal usury.  In other words, if the contracts do in fact constitute "loans" under section 5-501, they are usurious and, under the terms of section 5-501, void.

**D.**

When the highest court of a state has not directly spoken on a matter of state law, a federal court sitting in diversity must generally use its "own best judgment in predicting how the state's highest court would decide the case."  *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1314 (9th Cir. 1984) (internal quotation marks omitted).  In making this prediction, the federal court "must ascertain from all available data what the state law is and apply it."  *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982).  "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  *Id.* (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)).

To begin with, New York law is clear that "[w]hen determining whether a transaction constitutes a usurious loan it must be 'considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it.'" *Ujueta v. Euro-Quest Corp.*, 814 N.Y.S.2d 551, 552 (App. Div. 2006) (quoting *Lester v. Levick*, 376 N.Y.S.2d 619 (App. Div. 1975) (Christ, J., dissenting), *rev'd. on dissenting opn.* 41 N.Y.2d 940 (N.Y. 1977)). Thus, that the agreements are described by their language as "Purchase Agreement[s]" and not as loans is not dispositive; it is their "real character," when they are "considered in [their] totality," that matters here. *Id.*

Nonetheless, according to the New York Court of Appeals, "[i]f the transaction is not a loan, 'there can be no usury, however unconscionable the contract may be.' *Seidel*, 79 N.Y.2d at 744 (quoting *Orvis*, 157 N.Y. at 661). New York appellate courts have held that "[i]n order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender." *Donatelli v. Siskind*, 565 N.Y.S.2d 224, 226 (App. Div. 1991). Further, "[f]or a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *Rubenstein v. Small*, 273 A.D. 102, 104 (N.Y. App. Div. 1947); *see also Cash4Cases, Inc. v. Brunetti*, 167 A.D.3d 448 (N.Y. App. Div. 2018). Put simply, to constitute a "loan" under the usury statute, the purported lender must have the right to collect from the purported borrower in absolute terms—that is, a right not dependent on the occurrence of any condition precedent. Because Fast Trak has the right to collect from Sax *only if*

he or his clients obtain sufficient proceeds, Fast Trak argues, the transactions cannot constitute a "loan."

Two arguments push in the other direction. First is the possibility that Sax's obligation to make payments is sufficiently "guaranteed" by the terms of the agreement, such that what appears not to be a "loan" is nonetheless treated like one for the purposes of New York usury law. While the Court of Appeals has not addressed this possibility in the realm of litigation finance, at least one New York state trial court has held that a similar purported non-recourse litigation financing arrangement was a "loan" (and thus subject to usury laws) because the recovery of the underlying plaintiff—and therefore the financier's payment—was "almost guaranteed." *Echeverria*, 801 N.Y.S.2d 233, 2005 WL 1083704 at \*8. In *Echeverria*, the plaintiff Echeverria received a $25,000 "advance" from a company called LawCash to pursue his personal injury case, which he agreed to repay "at an interest rate of 3.85% compounded monthly to LawCash from any judgment awarded," *id.* at \*4, which the court noted was "an obviously usurious rate," *id.* at \*1. In finding that the finance agreement constituted a loan, the court concluded that:

> [T]here was a very low probability that judgment would not be in favor of the plaintiff. It is a strict liability labor law case where the plaintiff is almost guaranteed to recover. There is low, if any risk. This is troubling considering the enormous profits that will be made from the rapidly accruing, extremely high interest rates they are charging.

*Id.* at \*8.  The court also noted that, just like a bank making a loan, LawCash was able to demand its rate of return.  *Id.* at \*5 n.1.  The court then found that because the investment was a "sure thing," "it is a loan, not an investment with great risk.  If it is a loan, then the interest rate charged is usurious and the court could vitiate the agreement."  *Id.* at \*8.  Instead, because the law was uncertain, the court enforced the agreement at maximum statutory rate of 16% annual interest. *Id.*

Given that Fast Trak's realization of payment depends entirely on a condition—the receipts of either litigation proceeds by the client or attorney fees by Sax—Sax's argument that these agreements strictly qualify as "loan[s]" under New York law is questionable.  Nonetheless, with the Primary and Secondary contracts, the risk of non-payment might be so low that the financial agreement qualifies as a loan under New York law.  However, even if the transactions are not "loan[s]" under section 5-501, New York law still seems to permit a defense of usury in certain circumstances.

The second and more colorable argument against Fast Trak's characterization of the agreements addresses the "real character" of the agreements.  *See Ujueta*, 814 N.Y.S.2d at 552.  The Court of Appeals has repeatedly endorsed the principle that if an "agreement was not intended for the purpose indicated upon its face, but as a *mere device or subterfuge to conceal a loan of money[,]* . . . . it is quite possible that the defense of usury could be sustained." *Orvis*, 157 N.Y. at 660–61 (emphasis added).  This rule has some appeal, especially to payors: "[I]f the form of the contract were to be controlling, the statute against usury would be substantially unenforcible [sic], and thus it was made the duty of the court in each case presented to examine into the substance of the transaction between the parties and

determine whether the intent which pervaded it was one which violated the statute." *Hartley v. Eagle Ins. Co. of London, Eng.*, 222 N.Y. 178, 185 (1918) (quoting *Hall v. Eagle Ins. Co.*, 151 A.D. 815, 826 (N.Y. App. Div. 1912)). Thus, New York courts have affirmed this principle numerous times, usually in the mortgage context. *See, e.g.*, 72 N.Y. Jur. 2d Interest and Usury § 87; *Equity Serv. Corp. v. Agull*, 250 A.D. 96, 98 (N.Y. App. Div. 1937); *Hartley*, 222 N.Y. at 184–85; *Meaker v. Fiero*, 145 N.Y. 165, 169–170 (1895). However, no New York appellate or high court has addressed a defense of usury in cases involving litigation financing agreements where, similar to those here, the purported lender's risk of non-payment is arguably miniscule.

At oral argument before this court, Fast Trak argued that *Cash4Cases*, an intermediate appellate decision, is "the controlling law in New York." Oral Argument at 16:57, *Fast Trak Invest. Co. v. Sax*, No. 18-17270 (Feb. 3, 2020), https://youtu.be/6C1qJ9Bt1ws. It is true that this decision cannot be "disregarded" by this court. *Estrella*, 682 F.2d at 817. However, while *Cash4Cases* presents some facial similarity to this one, given its evaluation of a litigation finance agreement, it is easily distinguishable. In *Cash4Cases*, the challenged agreement appears to have been contingent upon "successful recovery of proceeds" from "defendant's [single] pending personal injury litigation." 167 A.D.3d at 448–49. Here, in sharp contrast, Fast Trak advanced money to Sax, the repayment of which was secured in each instance with his future attorney fees in about five to ten unrelated cases. Even the *Cash4Cases* court recognized that an agreement can constitute a loan if "the principal [is] in some way . . . secured as distinguished from being put in hazard." *Id.* at 449 (citing *Rubenstein*, 273 A.D. at 104).

To put it another way, if this case's facts aligned with those in *Cash4Cases*, such that Fast Trak was suing Sax for proceeds he purportedly owed it related to a single case, we might be inclined to agree that *Cash4Cases* would foreclose Sax's usury defense. As Fast Trak would have it, as long as there is *some* possibility that the assets listed in the agreements will not yield full payment to Fast Trak, the transaction cannot qualify as a "loan" and Sax may not sustain a usury defense. But unlike *Cash4Cases*, Sax has made a colorable argument that repayment to Fast Trak is all but guaranteed.

In summary, we are bound by New York law to analyze the transaction and determine its "real character." If the transaction's character is in fact the lending of money at a usurious rate, a defense of usury may be sustained even if the transaction fails to meet the legal requirements of a "loan" under section 5-501. *See Meaker*, 145 N.Y. at 170 (stating that "no matter what the disguise, if the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare, and to hold the security void."). As we see it, there is a nonfrivolous argument that the "real purpose" of these transactions is a loan rather than the purchase of contingent assets: Fast Trak wired funds to Sax; Fast Trak secured future payment by Sax with the potential proceeds in a large number of Sax's cases, thereby making Sax's obligation to pay Fast Trak arguably likely.

## E.

Furthermore, the record of this case is sufficiently established such that the outcome to the above legal question will determine the case's result. The New York Court of Appeals has held that whether a transaction constitutes a cover for usury "raise[s] a triable issue of fact" precluding

summary judgment. *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 594 (1981); *see also Ujueta*, 814 N.Y.S.2d at 552. These cases typically involved mortgages, and the triable issue was whether a broker's commission should be included in the interest rate calculation. *See, e.g.*, *ids.* Here, there is no question that the Pay-Off Amounts in the Secondary Contracts, if triggered, would exceed the maximum statutory rate. However, the relevant factual issue on remand would be whether the occurrence of the triggering condition (i.e., Sax's success in his cases) was sufficiently certain so as to constitute a "loan" or a "cover for usury."

Sax averred that "Plaintiff's loan was secured by other cases, so that unless I lost each and every case, Plaintiff still had the right to collect from the 'Secondary Cases.' To lose each and every case would be highly unlikely." Sax's declaration also includes several statements to the effect that the cases with which he secured Fast Trak's advances make up most or all of his firm's resources. He stated that four of the securing cases "that resulted in adverse defense verdicts drained my law firm, which was still struggling as a result of the 'Great Recession,'" that paying Fast Trak the amount it claims would put him "out of business" and "drive[] [him] into bankruptcy." Further, though, the record shows that Fast Trak's advances to Sax were secured by a total of at least eighteen cases.

Accordingly, if the New York Court of Appeals holds that the agreements can indeed constitute a "loan" or a "cover for usury" such that Sax may assert a usury defense under New York law, we will reverse the district court's grant of summary judgment to Fast Trak and remand for further proceedings consistent with the answer to the certified question. On the other hand, if the Court of Appeals holds that such agreements do not constitute a "loan" or a

"cover for usury," these facts are irrelevant (that is, not "material" for the purposes of a summary judgment motion). In this case, we will affirm the district court's grant of summary judgment for Fast Trak.

## F.

Finally, there also exists some confusion regarding the consequences of a successful usury defense under New York law. The Court of Appeals has previously held that "[t]he consequences to the lender of a usurious transaction can be harsh: the borrower is relieved of all further payment—not only interest but also outstanding principal, and any mortgages securing payment are cancelled. In effect, the borrower can simply keep the borrowed funds and walk away from the agreement." *Seidel*, 79 N.Y.2d at 740. However, the *Echeverria* court enforced the agreement, limiting interest to the maximum statutory rate. 801 N.Y.S.2d at *8. Given this uncertainty, we also certify the question of the appropriate consequence to the Court of Appeals, as proposed below.

## III.

Applying these state-law doctrines to a novel type of contract—secured financing agreements like the ones in this case—is a job most suitable for the highest court of the state whose law is in question. This is particularly the case when, as here, the result is likely to have wide-reaching implications. Litigation financing is a rapidly growing industry. N.Y. Bar Opinion, 2011 WL 6958790 at *1. Other states that have addressed whether similar agreements

violate usury laws have reached conflicting results.**[8]**  Given the importance of the issue, it would be preferable for the New York Court of Appeals to address this issue in the first instance.

While the parties did not request the certification of this question, we have the authority and obligation to certify a question sua sponte.  *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist., No. 1*, 294 F.3d 1085, 1086 (9th Cir. 2002) ("[W]e have an obligation to consider whether novel state-law questions should be certified—and we have been admonished in the past for failing to do so.") (citing *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 62, 76–79 (1997)); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (noting that federal certification of state law questions "helps build a cooperative judicial federalism," and is "particularly appropriate" for novel or unsettled questions of state law).

Further, certification is permitted under New York law when the New York Court of Appeals has not yet provided controlling precedent.  N.Y. Comp. Codes R. & Regs. tit. 22,

---

**[8]** *Compare Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400, 410 (Col. 2015) (holding "that litigation finance companies that agree to advance money to tort plaintiffs in exchange for future litigation proceeds are making 'loans' subject to Colorado's [Uniform Consumer Credit Code] even if the plaintiffs do not have an obligation to repay any deficiency if the litigation proceeds are ultimately less than the amount due.  These transactions create debt, or an obligation to repay, that grows with the passage of time.") *with Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776, 782 (Tex. App. 2007) (holding that litigation funding agreements entered into by investor and petroleum companies, under which investor provided funds to finance companies' lawsuit against multinational corporation in return for portion of companies' recovery in lawsuit, were not usurious transactions, as they did not meet the definition of a "loan").

§ 500.27(a). As explained above, whether New York law permits a defense of usury in these circumstances is a question for which no controlling precedent of the Court of Appeals exists. Because the resolution of this question will determine the result of this case, we believe certification is proper.

Accordingly, as stated above, we respectfully certify the following question to the New York Court of Appeals:

> Whether a litigation financing agreement may qualify as a "loan" or a "cover for usury" where the obligation of repayment arises not only upon and from the client's recovery of proceeds from such litigation but also upon and from the attorney's fees the client's lawyer may recover in unrelated litigation?
>
> *And*, *if so*, what are the appropriate consequences, if any, for the obligor to the party who financed the litigation, under agreements that are so qualified?

We do not intend our framing of this question to restrict the New York Court of Appeals' consideration of any issues that it determines are relevant. The New York Court of Appeals may, in its discretion, reformulate the question. *See, e.g.*, *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999).

The clerk of our court is hereby ordered to transmit forthwith to the New York Court of Appeals, under official seal of the United States Court of Appeals for the Ninth Circuit, a copy of this order and all relevant briefs and excerpts of record filed in this court. The record contains all

matters in the pending case deemed material for consideration of the local law question certified for answer.

Further proceedings in our court are **stayed** pending the New York Court of Appeals' decision whether it will accept review, and if so, receipt of the answer to the certified question. This case is **withdrawn from submission** and the clerk is directed to close this docket administratively, pending further order from this court. When the New York Court of Appeals decides whether to accept the certified question (or orders briefing on the question), the parties shall file a joint report informing us of the decision. The parties shall also file a joint status report notifying us when briefing has been completed, and when a date is set for oral argument before the New York Court of Appeals. The parties shall finally file a joint status report every six months after the date that the New York Court of Appeals accepts the certified question (or orders briefing thereon), or more frequently if circumstances warrant.

**QUESTION CERTIFIED; SUBMISSION WITHDRAWN and PROCEEDINGS STAYED.**